DOMENGEAUX, Judge.
This is a personal injury suit originally brought in the court below by Louis Joseph Savoy on behalf of his minor son Sidney Dean Savoy who sustained injuries during the opening of a highway bridge span under the control of the Louisiana Depart *94 ment of Highways, the only defendant. Plaintiff brings this suit by authority of a Legislative resolution whereby the defendant has consented to be sued and waived its official immunity. Liability of the Department is based essentially on the alleged negligence of the bridge tender in failing to discover young Savoy on the bridge in time to prevent his injury. The defendant answered the suit, denying any negligence, and specially pleading contributory negligence on the part of the injured minor.
Before trial, the mother of the minor, upon motion and affidavit, was substituted as the proper party plaintiff due to the fact that the original plaintiff, her husband Louis Joseph Savoy, had absented himself from the State of Louisiana, going to the continent of Africa and that all diligent efforts to locate him were to no avail. Apparently there has been no opposition to this substitution.
After trial on the merits, the trial judge, finding negligence on the part of defendant’s bridge tender and no contributory negligence on the part of the minor, awarded damages. Defendant has appealed.
Neither party makes an issue of quantum, and the appellant specifies as errors, the following:
1) the lower court erred in holding the Department bridge tender negligent in that the standard of care to which the court held the bridge tender was higher than should have been required under the circumstances, and
2) the lower court erred in holding that the plaintiff’s son was not guilty of contributory negligence.
The bridge in question spans the Bayou Teche in the City of St. Martinville, Parish of St. Martin. The bayou at that point runs generally north and south and the bridge runs east and west across the bayou, and opens in a northerly direction on the east end. The warning devices on the bridge consist of red blinker lights on fixed posts, one on the north end and one on the south end of the bridge. There are also drop gates for both vehicular and pedestrian traffic on the west side and for the vehicular traffic on the east side. There is a 9.x 12 bridge control house situated at the southeast corner of the bridge approach. It has a door on the north (street) side with a window on each side of the door, windows on the south side and a window on the east and west sides. The electric control panel is located on the west end of the building below the window through which the bridge tender has a view of the bridge while inside the bridge house at the control panel. The drop gate on the east or bridge-house side of the bridge is some 10 feet east of the bridge house.
The accident occurred at approximately 6:15 P.M. on June 26, 1968, during daylight hours. On the date in question, Mrs. Enola Dautreuil, the bridge tender and operator regularly employed by the defendant Louisiana Department of Highways, had begun opening the bridge for passage of a tugboat with several barges in tow which was approaching the bridge from the south. Plaintiff’s minor son, who was then 10 years and seven months old, was injured as the result of having caught his foot between the span opening and bridge approach at the ast end, crushing three toes and necessitating their amputation.
The bridge tender Mrs. Dautreuil was 63 years of age, and had been serving in that capacity for some 15 years, having succeeded her husband in that position in 1953 upon his retirement. She testified that she left her home located a short distance away and drove with her husband to the bridge where they sat awhile in their car parked near the bridge house. She eventually *95 walked to the middle of the bridge and observed the tug and barges approaching the bridge. She remained on the bridge awaiting the customary horn signal from the tug indicating it was ready for the bridge to be opened. When the signal came (three blasts from the tug) she was outside of the bridge house and, according to her testimony, had cleared the premises of bystanders. At this time, according to her, there were no pedestrians on the bridge. She then went into the bridge house, engaged the control to lower the bridge gates and blew the signal, which consisted of four blasts, signifying to the tug operator that the bridge was not yet opened but that preparations were being made to open it. ■ She further states that she then went to the door of the bridge house facing the street and sidewalk to make sure that the premises were clear of children and returned to the control panel to engage the control withdrawing the wedges securing the span opening to the bridge approach. There are needle indicators on the control panel which Mrs. Dautreuil observed, showing that the wedges were withdrawn. She testified that she again went to the door to see if there were any children beyond the gates on the bridge and only then did she engage the span opening control. She stated that at this time her husband was sitting in the east end of the bridge house. Following the engagement of the span opening lever, she stated that she then started outside the bridge house to observe the passage of the tug and barges. It was at this point that she saw young Sidney Dean Savoy hopping toward the bridge house generally from the northeast ’ corner of the bridge with his foot injured. She was very emphatic in stating that she at no time had observed young Savoy on the bridge except immediately following his injury as he came hopping toward the bridge house.
Young Sidney Dean Savoy testified that he walked onto the bridge from the east on the lefthand side going by the bridge house and that when he did so, the barrier gate on the east side was not down but was still in a straight up position. He said that it was his intention to go across the bridge to meet his older brother who was on the other side. He testified that the bridge was not in motion when he entered and that traffic was traveling on the bridge when he got upon it. He further testified that he walked on the south sidewalk portion of the bridge to the second post and at that point he stopped and stooped over to look at a turtle on a log in the bayou. He stated that he remained stooped down and stayed in this position for about five or six minutes and that no one told him to get off the bridge. He further stated that at that time he didn’t hear any whistles but when questioned further he remembered hearing a whistle before getting on the bridge but he explained it by saying that he presumed it was the 6:00 P.M. town whistle. While he was in this stooped position and apparently sheltered by the bridge post, the bridge began to open and he became frightened and made a quick run with the intention of jumping off the bridge at the northeast corner on to the street. He said that he did jump at the northeast corner, leaping through a space of approximately three feet and, missing the clearance, caught his right foot between the span opening and the bridge approach, causing the injuries referred to.
The trial judge rendered oral reasons for his ruling at the termination of the trial which were transcribed for the record and he was impressed with the truthfulness of all witnesses who testified. He found, and it is apparent to us, that young Savoy got onto the bridge unnoticed while Mrs. Dautreuil was inside the bridge tender house and prior to the time that the gates were lowered and the bridge began to open. Mrs. Dautreuil herself admits that this was distinct possibility. He was not prohibited, at that time from entering the bridge. The testimony indicates and the photographs admitted into evidence show *96 rather conclusively that Mrs. Dautreuil, while inside the house, could not see young Savoy who was stooped behind the second bridge post along the south sidewalk of the bridge. In order to see him, she would have had to be outside the structure. The mechanics of her operation would have easily allowed her to step out of the house, thereby allowing herself a full view of the complete bridge. Had she done so, she would have readily and easily discovered the presence of the young boy.
The record reflects that whenever it was necessary to open the bridge, the bridge tender had difficulty with children' congregating in the area to watch the bridge opening operations. This situation was compounded in severity during the summer months when all of the children are on vacation. She usually found it necessary at these times to request assistance from the local police in keeping children out of the area during bridge openings. Her husband usually helped her in this surveillance and would remain outside of the bridge tender house to be sure that no children or pedestrians were on the bridge prior to the opening. On the date of the accident in question, however, her husband was ill and did not help in this endeavor but rather went into the bridge tender house and there remained both before and during the operation. In view of the fact that children were in the vicinity and that usually she needed help from the local police and/or her husband to clear the bridge of them, she should have known of the dangers involved and not opened the bridge until she was sure that no one was on it. She could not determine this from her vantage point inside the house. Although she may have thought that her husband was outside at the time, where he would have had full surveillance of the bridge, in truth he was not, as the evidence points out.
The span bridge with its attendant operations is a dangerous instrumentality accommodating both vehicles and pedestrians. In view of all the circumstances of this case, Mrs. Dautreuil was negligent, on the occasion at bar, in not ascertaining that the bridge was completely clear of pedestrians and in not leaving the bridge tender house and going to a vantage point where every portion of the bridge could be viewed before actually opening the span. We agree that the standard of care imposed by the trial court was proper.
On the question of young Savoy’s contributory negligence, the trial court found, as do we, that it is reasonable and plausible that young Savoy would have stopped to gaze at a turtle on a log, as he said he did, knowing that youngsters of his age group are usually consumed with curiosity of the things that occur around them, and being so consumed did not notice anything unusual around him until he felt the movement of the bridge span as it began to open. He cannot be held negligent in entering upon the bridge span as the gates were not down nor were the signals flashing, and there was nothing else of such a nature as to preclude his proceeding across the bridge. The trial judge accepted as reasonable the minor’s explanation that he thought that the whistle which he heard was the 6:00 P.M. town whistle. We cannot say that the trial judge erred in this respect in view of the great discretion which a trial judge possesses in determining the veracity of a witness and the reasonableness of his answers. The trial judge had this to say concerning young Savoy’s activities:
«* * * The court finds that because of his age and his curiosity and his youth, that it’s hardly possible to find him guilty of contributory negligence for stopping upon a bridge which he had no reason to believe would be opened on the sidewalk to watch through the bridge panel a turtle sunning itself on a log. According to the testimony of young Savoy, he was only made aware of the bridge opening when he felt the motion.
*97 He thereupon began to run in a northeast direction in an attempt to extricate himself from what he considered a perilous situation. When he reached the northeast corner of the bridge, he jumped to what he thought was safety. However, because of his size, his leap was not sufficient and his right foot became wedged. When being questioned by able counsel for the defendant, this young man readily admitted that upon reflection he realizes that had he remained on the bridge span, that he would have been in a position of complete safety. However, his answer was simply that when the bridge began to move, he became frightened, and his first thought was to leave the bridge. The court finds that this is the only possible act of contributory negligence which this young boy might be found guilty. * * *”
and in holding young Savoy free of negligence, the trial judge correctly applied the rationale of Woods v. Cappo, La.App., 232 So.2d 578, and the cases cited therein.
It is well recognized that a young person of Dean Savoy’s age is capable of contributory negligence, however the test for contributory negligence on the part of a youth is not the same as that of an adult, that is to say, the child’s age, intelligence and experience under the particular circumstances must be considered and they are not expected to react in the same manner as an older or more mature person. Woods v. Cappo, supra.
It is probable that had young Savoy remained where he was when he realized that the bridge was moving, he may not have been hurt, however under the test of the Woods case, he is to be excused from negligence in moving from what (in retrospect) was a safe place on the bridge after it started moving. The boy became frightened and ran to a place where he thought he could jump off. He was pre-occupied m gazing at an object which normally arouses a youngster’s curiosity, and while so engaged, he suddenly realized that the bridge began to move. His youth and immaturity shields him from the legal consequences of any misjudgment he may have made in running to what appeared to him at the time to be a place of safety, and thereby injuring himself in the process.
We find no error in the trial court’s factual or legal conclusions in this case. Accordingly, for the above and foregoing reasons, the judgment of the trial court is affirmed.
Affirmed.